# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1649-23

V.J.R.,[1]

    Plaintiff-Respondent,

v.

R.F.R.,

    Defendant-Appellant.

_____

Submitted February 26, 2025 – Decided April 28, 2025

Before Judges Currier and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FV-02-2157-23.

Bailey & Toraya, LLP, attorneys for appellant (Adam W. Toraya, on the brief).

Respondent has not filed a brief.

---

[1] We use initials to protect the parties' privacy and the confidentiality of these proceedings. R. 1:38-3(d)(10).

PER CURIAM

Defendant R.F.R. appeals from a January 12, 2024 final restraining order (FRO), which was entered pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Defendant contends the trial court erred in finding plaintiff V.J.R. proved the predicate act of harassment. Because the judge's findings were supported by adequate, substantial evidence, including testimony he found credible, we affirm.

After each party obtained a temporary restraining order (TRO) against the other, the court conducted a trial over twelve non-consecutive days in 2023 and 2024, at the conclusion of which the court granted each party an FRO. We derive the following facts from the trial.

Because only defendant appeals the entry of the FRO, we focus on the evidence produced by plaintiff to support the court's order.

The parties were married in 2005 and have three children together. After hearing several days of testimony, the court advised it was referring the case to the New Jersey Division of Child Protection and Permanency due to its concern for the children's well-being. The court was particularly concerned about the parties having involved their children in their marital disputes to the extreme

extent of instructing the children to video and record arguments between the parents as they occurred.

The parties had discussed ending their marriage and argued over issues related to a divorce for several years before plaintiff filed her divorce complaint in March 2023. According to plaintiff, defendant was angry that plaintiff filed her complaint at that particular time because defendant was "embroiled in a lawsuit for [their] oldest son, . . . who was expelled from the school that he attended for ten years in November [2023]. "

Plaintiff admitted to having an extramarital affair with a coworker in 2018-2019. After defendant found out about the affair in April 2019, he filed a whistleblower claim with the Securities Exchange Commission (SEC) against plaintiff's employer. Plaintiff testified she learned about the claim when she saw the whistleblower report on defendant's desk. She stated defendant told her he made the complaint "in retaliation for the affair."

Plaintiff further testified that defendant said the SEC report was his "golden parachute as a result of [her] affair." Plaintiff was afraid the complaint could cause her to lose her license and would damage her reputation. In addition, plaintiff stated defendant threatened to request the court grant him full custody of the children because plaintiff "worked so long and such long hours."

3

Plaintiff said she was "petrified" of losing her children. After an investigation, the SEC found the complaint meritless.

During his testimony, defendant stated he filed the SEC report to "help" plaintiff. He testified he "thought [he] was doing the right thing at the time" he filed the complaint. Nevertheless, according to plaintiff, after she filed for divorce, defendant threatened to file another SEC report and inform the SEC about a dispute plaintiff's new employer was having with a previously terminated employee.

Plaintiff also discussed three incidents in 2019 when defendant slapped her. During one interaction, while their children were present, the parties were arguing about plaintiff's affair, defendant became intoxicated, slapped her and shoved her onto the patio. In the second incident, plaintiff found defendant had ransacked her closet, strewing clothes, shoes and other items everywhere. She testified defendant also slapped her across the face. When plaintiff asked what he was doing in her closet, defendant responded that he was looking to see if she had a secret phone to call the man with whom she was having an affair. Defendant also called her a "motherless whore," a phrase he frequently used towards her.

4

Defendant provided a different account of this event. He said he made comments to plaintiff that caused her to "unravel[]" and "she started screaming for [the] kids to call the police." He testified that the two argued and "then she attacked [him]." Defendant testified he also found a phone that plaintiff used to communicate with her paramour.

A few months later, according to plaintiff, defendant again slapped her across the face and called her a whore. She did not file a police report or apply for a restraining order for any of the times defendant slapped her because she was afraid of losing custody of her children. She conceded that during this incident she ripped defendant's shirt.

Plaintiff testified that in May 2020, "[defendant] beat [her] so badly that from that point on [she] never laid a hand on him ever again because [she] was actually afraid that he would kill [her] that night." On the night of this beating, defendant had learned he failed the bar exam. He told plaintiff it was her fault and "punch[ed] [her] on the right side of the head between four and five times to the point where [she] could see stars it was so painful." He blamed plaintiff and her affair for his distraction and inability to study.

Plaintiff testified to additional incidents in 2020 when defendant called her derogatory names and threw a chair at her although he missed. The children

 A-1649-23

were there and crying. On another day, defendant printed out the text messages between plaintiff and the man she had an affair with and was reading the messages to their children, aged seven, ten, and twelve at the time.

Plaintiff also testified about an incident in 2023 that occurred while she was cooking. She said defendant stood next to her by the stove and shoved her out of the way. She fell to the ground. Defendant then picked up the pan and dropped it on the floor. She did not call the police because she was scared and did not want to upset her youngest son who was home at the time. However, she took a picture of the incident and sent it to her attorneys.

Around this same time, plaintiff realized all of her emails from her Gmail account were being forwarded to defendant's email address. Once she learned this, she changed the settings in her account. She testified she never gave defendant permission to forward her emails to his account. She also stated that defendant "logged into [her] network" on his laptop after plaintiff obtained a TRO.

According to plaintiff, another physical altercation occurred in 2023, which was triggered by an email from their eldest son's principal, advising the child had performed well that semester. She stated defendant was angry because he did not want the child to succeed "because he thought it would impact the

6

lawsuit against [the son's school]."  Defendant said they would be unable to prove their damages claim if the child was doing well.  After she showed defendant the email, he got physical with her, spinning her "around [and] against the wall. . . [and] put[ting] his hands, both of them, around [her] throat and sa[ying], you stupid whore, I told you not to do this.  This is going to ruin any money that we get from the lawsuit.  I told you not to."

Plaintiff said defendant hurt her neck and shoulder area as well as her head.  She explained she did not call the police because her daughter was home.

Plaintiff testified she and defendant shared a joint checking account.  At one point, defendant withdrew all but $6.25, leaving her nothing to pay the bills.

Defendant moved out of the marital home in April 2023.  Plaintiff testified she has an alarm system in her house.  She said she changed the passcode after she obtained the TRO but then discovered the code was subsequently changed again.  The alarm company advised plaintiff her contact information was removed from her account and replaced with defendant's information.  Plaintiff also testified that defendant attempted to access her Apple ID account but she "immediately changed [her] password."

In May 2023, defendant sent an email to a group of parents at their son's school "discussing the TRO, personal details of the TRO[,] and discussing the

fact that [plaintiff] h[as] a mental illness that was exacerbated by the death of [her] parents." In the email defendant also wrote: "I do not expect [plaintiff] to bring my kids to dad's night and I would be arrested if I asked her to." Plaintiff testified that she has never been diagnosed with a mental illness or taken medication for a mental illness. She explained she was embarrassed and angry when she found out about the email. She also testified she never refused defendant parenting time.

Defendant also emailed the priest at the children's school, stating "[plaintiff]'s been looking for any excuse to cast me as the villain to end our marriage ever since she was fired from her previous job for having an affair with a subordinate." She testified she was not fired for having an affair with a subordinate.

During defendant's testimony, he described multiple incidents when plaintiff struck him. Plaintiff did not dispute she hit defendant at times. Defendant also testified plaintiff had a drinking problem, causing her to fall on several occasions, and she frequently screamed at the children. We need not describe in detail defendant's allegations against plaintiff since the court issued an FRO against her and she has not appealed from that order.

On July 13, 2023, plaintiff presented a witness, Michael Gallagher, who attended community college for one year and studied computer science for one year at DeVry University. He works in his own business as a computer technician and IT consultant, providing IT support for thirteen years. He did not have any certifications with Apple Products or in the field of IT and had never testified as an expert before. The judge found Gallagher could assist the court and allowed him to testify as an expert in IT support. Defendant's counsel did not object but reserved his right to "a rebuttal witness."

Gallagher stated he "reviewed all of the devices that were [at plaintiff's home], . . . her laptop and some Apple devices, and the network." He testified his inspection revealed plaintiff's emails were being forwarded to defendant's email address. He explained the process of forwarding emails, which was achieved in the phone's settings. The person to whom the emails were being forwarded to had to click a verification that they would accept the incoming emails.

On December 5, 2023, defendant requested an adjournment because his IT forensic expert witness was unavailable for the December 7 trial date. Defendant contended his expert would contradict Gallagher's testimony

9

regarding the forwarding of emails. The court denied the request. The trial continued on December 7, and all trial testimony was completed that day.

On December 27, defendant moved to reconsider the denial of the adjournment request.[2] The court denied the motion. However, the court advised it intended to "address the [FRO] against both parties without reference to the issues regarding electronics, changing of passwords and such so the testimony of [defendant's proffered witness] [wa]s not necessary and the [c]ourt w[ould] enter an order based on evidence that ha[d] been presented to [it]."

In its well-reasoned January 12, 2024 oral decision, the court assessed the credibility of both parties. It stated: "I have a concern with the credibility of both parties," explaining:

> The demeanor of the parties brought concern . . . . [Defendant] was often evasive and not seeking any eye contact with this [c]ourt and often was physically moving, which this [c]ourt noticed. And [plaintiff], also to some extent [regarding] some of the event[s] was also not reasonable and often evasive in her testimony as well.
>
>  . . . [Defendant] was often reluctant to answer certain issues on questions that were presented to him

---

[2] We note the expert report is dated December 14, 2023, so it is unclear whether the report was completed by the adjourned November 29 trial date, the December 7 trial date, or if it had been provided to plaintiff ahead of those dates in order for the expert to testify.

A-1649-23

on cross examination and ultimately the believability of the testimony is of concern to this [c]ourt.

The court found plaintiff presented evidence of harassing conduct under N.J.S.A. 2C:33-4 with her testimony regarding the incident of being pushed and shoved while cooking, defendant's threat to report her to the SEC and her current employer, and the emails to the children's school and to parents of other children in the school. The court did not find defendant's testimony credible that he filed the first report with the SEC to protect plaintiff.

The court further found plaintiff's testimony established that defendant's conduct and actions demonstrated a purpose to harass plaintiff. In addition, the court found plaintiff presented sufficient credible evidence to support the predicate act of assault, N.J.S.A. 2C:12-1.

After concluding defendant also established several predicate acts of domestic violence against plaintiff, the court determined both parties required the protection of an FRO. The court stated: "I find by a preponderance of the evidence that the . . . life, health, and well-being [of each party] ha[s] been and are endangered by the acts of [the other]. Entering a restraining order is necessary for each of the [parties'] protection."

A-1649-23

On appeal, defendant contends the trial court erred in not granting his adjournment request thus preventing his expert from testifying and that plaintiff did not establish a predicate act of harassment.

When the parties concluded their tenth day of trial on November 13, 2023, they agreed to appear for trial on November 29. The court advised counsel the case was 221 days old, and it did not want further delays. The court then stated: "So [defendant's counsel], you have an expert[,] [are you] going to give [plaintiff's counsel] the report?" Defendant's counsel replied "Yes, as soon as I get one."

The parties next appeared in court on December 7, 2023. The transcript reflects plaintiff's counsel was sick on November 29 which is why the court rescheduled the trial date for December 7. The court noted defendant's attorney had requested an adjournment on December 5 because his expert was not available for testimony on December 7. The court noted the case was now 245 days old and "the issue . . . of a computer expert was known." The court reiterated it was denying the adjournment request. Defendant then rested his case. Plaintiff was called as a rebuttal witness and the testimony in the case concluded that day.

A-1649-23

On January 12, 2024, the court addressed defendant's motion for reconsideration, stating:

> This [c]ourt opines that [i]n . . . this matter there was a trial date set for . . . December . . . 7[], 2023.  The date prior[,] . . . the attorney for [defendant] sought an adjournment to allow his expert who was not available on that date to participate in this matter.  That request for an adjournment was denied, as counsel for [defendant] was aware of this date, did not check with his expert as to his availability until the very last moment, and to further add to the length of the trial . . . did not serve the expeditious [requirement].

The court was within its discretion to deny any further adjournments in the case.  Michael Gallagher had testified in July 2023 regarding the setting on plaintiff's phone which was forwarding her emails to defendant.  There were five more days of trial after that during which defendant could have produced his expert.  Moreover, as of November 13, defendant had not served plaintiff with an expert report.  Since the ultimate report was dated December 14, 2023, it is unlikely the court would have permitted the expert to testify on November 29 without production of his report.  As stated, the record does not reflect when or whether a report was in fact served before being appended to the motion for reconsideration.

Notwithstanding the court's proper exercise of its discretion regarding the adjournment request, it eliminated any potential for prejudice to defendant in

13

determining not to consider any testimony of the parties or Gallagher regarding the misuse of electronic devices. Therefore, the court did not err in its decision to deny the last-minute adjournment request.

We turn to defendant's contentions regarding the grant of the FRO.

"In [our] review of a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." J.D. v. A.M.W., 475 N.J. Super. 306, 312-13 (App. Div. 2023) (quoting N.T.B. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015)).

"We defer to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). A judge's legal conclusions are reviewed de novo. Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019).

The entry of an FRO under the PDVA requires the trial court to make certain findings pursuant to a two-step analysis delineated in Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Initially, the court "must determine whether the plaintiff has proven, by a preponderance of the credible

evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)). Harassment and assault are among the predicate acts included in N.J.S.A. 2C:25-19(a). See N.J.S.A. 2C:25-19(a)(2), (13). Second, the judge must determine "whether a restraining order is necessary . . . to protect the" plaintiff from immediate harm or further acts of violence. Silver, 387 N.J. Super. at 127.

A person commits harassment "if, with purpose to harass another," he or she:

> (a) Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> (b) Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> (c) Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [N.J.S.A. 2C:33-4(a) to (c).]

We have detailed the testimony the court found supported the finding of harassment. Plaintiff presented multiple incidents of conduct that amply demonstrated defendant's purpose to harass and annoy her. Moreover, the court found plaintiff also established the predicate act of assault, a finding amply

15

supported by plaintiff's testimony.  See Silver, 387 N.J. Super. at 125 (a trial court need only find a party proved that one of the predicate acts set forth in N.J.S.A. 2C:25-19(a) occurred).  The issuance of the FRO against defendant is supported by substantial credible evidence in the record.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-1649-23